UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ISAAC ALEXANDER,

                Plaintiff,                Case No. 2:21-cv-12369
                                          District Judge Nancy G. Edmunds
v.                                    Magistrate Judge Anthony P. Patti

DATTAHN JAMAL WADE,

                Defendant.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS
TO PLAINTIFF'S CONSTITUTIONAL CLAIM (ECF No. 26) and ORDER
STRIKING REPLY BRIEF (ECF No. 36) AS UNTIMELY**

**I.**    **RECOMMENDATION**:  The Court should **DENY** Defendant's motion for

partial summary judgment (ECF No. 26) and permit Plaintiff's constitutional claim

to proceed.

**II.**    **REPORT**

    **A.**    **Background**

       This lawsuit stems from the alleged events of October 10, 2018, when Isaac

Alexander alleges he got into a physical altercation with his fiancée, Starr Rivers,

who was carrying a firearm.  (ECF No. 1, PageID.2 ¶¶ 5-7.)  According to

Alexander, Rivers "reached for it to grab it," but Alexander "grabbed it first to

prevent her from harming him with it[.]"  (*Id*., ¶ 7.)  Alexander alleges that off duty

Detroit Police Officer Wade "arrived on the scene, and instructed [Alexander] to drop the firearm," Plaintiff "immediately threw the firearm away . . . [,]" but Officer Wade "still shot him in his right leg near his groin area[,]" which "destroyed his femur bone." (*Id.*, ¶ 8.)  Alexander then underwent reconstructive surgery. (*Id.*, ¶ 10.)[1]

Alexander was charged with several crimes. *See* Case No. 18-008418-01-FH (Wayne County).  His trial began on August 13, 2019.  On August 21, 2019, a jury found Alexander guilty of felonious assault, obstructing a police officer, felon in possession of a firearm, domestic violence, and three counts of possession of a firearm during the commission of a felony, second offense.  He was remanded, and, on September 10, 2019 was sentenced to prison.

Shortly thereafter, Alexander filed a claim of appeal.  On August 12, 2021, the Michigan Court of Appeals issued a lengthy opinion, affirming Alexander's convictions. *People v. Alexander*, No. 350816 (Mich. App. 2021).  On September 9, 2021, Alexander filed an application for leave to appeal, which the Michigan Supreme Court denied on January 31, 2022. *People v. Alexander*, No. 163518, 969 N.W.2d 32 (Mich. 2022).

---

[1] *See also* ECF No. 26-2 (Police Officer Wade Police Report), ECF No. 26-3 (Additional Police Reports).

At some point in 2022, Alexander filed a motion for relief from judgment. (ECF No. 30, PageID.253, 342-375.)  He also appears to have written to the Wayne County Prosecutor's Office Conviction Integrity Unit.  (*Id*., PageID.376-377.)

## B.    Instant Lawsuit

On October 2, 2021, while located at the Michigan Department of Corrections (MDOC) Lakeland Correctional Facility (LCF), Alexander initiated this lawsuit against Wade.  Distinct from Plaintiff's state court convictions, the case before this court challenges Defendant Wade's use of deadly force on October 10, 2018.[2]  Plaintiff's causes of action include excessive force under the Fourth Amendment, assault and battery, and gross negligence under Mich. Comp. Laws § 691.1407(7).  (ECF No. 1, PageID.3-4 ¶¶ 11-19.)  Plaintiff seeks compensatory and punitive damages.  (*Id*., PageID.4 ¶¶ 20, 1-4.)

_____

[2] "[W]hen a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence[.]" *Heck v. Humphrey*, 512 U.S. 477, 487 (1994).  Defendant Wade does not raise the issue; therefore, this report assumes Wade agrees that Alexander's excessive force claim before this Court is not inconsistent with Alexander's state court convictions. *Schreiber v. Moe*, 596 F.3d 323, 334 (6th Cir. 2010) ("The mere fact that the conviction and the § 1983 claim arise from the same set of facts is irrelevant if the two are consistent with one another.").  And, as it turns out, the question here is not whether Plaintiff was properly arrested; rather, it is whether the force used to subdue him was excessive.

Alexander is currently incarcerated at the MDOC's Cooper Street Correctional Facility (JCS).  *See* www.michigan.gov/corrections, "Offender Search," last visited Apr. 5, 2023.

### C.    Instant Motion

Judge Edmunds has referred this case to me for pretrial matters.  (ECF No. 6.)  Currently before the Court is Defendant Wade's October 5, 2022 motion for partial summary judgment as to Plaintiff's constitutional claim.  (ECF No. 26.)[3]

Plaintiff filed a timely response on October 25, 2022.  (ECF No. 30.)  "If filed, a reply brief supporting such a motion must be filed within 14 days after service of the response . . . ."  E.D. Mich. LR 7.1(e)(2)(B).  Defendant Wade filed his reply on November 15, 2022 (ECF No. 36), *i.e.*, twenty-one (21) days after the response was filed, without explanation as to its lateness and without requesting an extension.  Thus, the reply (ECF No. 36) is tardy, and, accordingly, it will be stricken from the record.

---

[3] This Court has jurisdiction over Plaintiff's 42 U.S.C. § 1983 Fourth Amendment excessive force claim under 28 U.S.C. § 1331 ("Federal question") and has jurisdiction over Plaintiff's assault & battery and Mich. Comp. Laws § 691.1407 gross negligence claims under 28 U.S.C. § 1367 ("Supplemental jurisdiction"). Aptly labeled a motion for partial summary judgment, Defendant Wade contests only the merits of the constitutional claim.  (ECF No. 26, PageID.145.)

4

**D.    Standard**

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (internal citations omitted).

"The moving party has the initial burden of proving that no genuine issue of material fact exists . . . ."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); cf. Fed. R. Civ. P. 56 (e)(2) (providing that if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for the purposes of the motion.").  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  To

5

survive summary judgment, one "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. *See also Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts . . . .   [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citations omitted).  Moreover, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack v. Damon Corp.*, 434 F.3d 810, 814 (6th Cir. 2006) (internal quotations and citations omitted) .

Summary judgment is appropriate if the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *City Management Corp. v. United States Chem. Co.*, 43 F.3d 244, 254 (6th Cir. 1994).  In other words, summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case. . . ." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

E.   **Discussion**

1.   **Plaintiff's factual allegations concern the presence of a firearm & Wade's use of deadly force.**

6

Plaintiff alleges that, on October 10, 2018, he and Ms. Rivers, were on Rohns Street in Detroit, Michigan around 7:00 p.m.  (ECF No. 1, ¶ 5.)  He alleges they "were sitting in [h]is car, when Starr Rivers found another woman's earring in his car and she became highly upset at him."  (*Id.*, ¶ 6.)  Then,

- Rivers got upset and threw some water at him and the Plaintiff got out of the car to calm her down and stop her from attracting attention from the neighbors[.]  Starr grabbed him and he grabbed her and they tussled and end[ed] up falling down on the ground of the vacant lot near her home[.]  [D]uring the tussle[,] her [f]irearm fell out of her holster and she reached for it to grab it, but . . . Plaintiff grabbed it first to prevent her from harming him with it, because she was upset.[4]

- While the Plaintiff, Isaac Alexander, was holding her [f]irearm, the off-duty Detroit Police Officer, Dattahn Jamal Wade arrived on the scene, and instructed the Plaintiff to drop the firearm[.]  The Plaintiff immediately threw the firearm away and the off-duty officer Dattahn Jamal Wade still shot him in his right leg near his groin area that destroyed his femur bone.

- The Plaintiff fell to the ground and stated: "Why did you shoot me[?]  I [did not] [h]ave the gun[.]

(ECF No. 1, PageID.2 ¶¶ 7-9.)  Plaintiff alleges that "Starr Rivers drove the Plaintiff to the [h]ospital to receive medical treatment," but she had a car accident, so "the Detroit Police had to transport [Plaintiff] the rest of the way to the hospital[,]" where he underwent "emergency reconstructive surgery," including

---

[4] *See also* ECF No. 30, PageID.274 ¶ 12 (Jakkia Jackson's January 18, 2022 affidavit, which states she "saw Starr's gun on the ground and Starr and Isaac both w[ere] reaching for it.").

insertion of "a steel rod in his right leg and pins to connect his leg to his hip, because the femur bone was destroyed."  (*Id.*, PageID.2-3 ¶¶ 10, 15-16.)

## 2.    Fourth Amendment, reasonableness of force, & *Graham*

Plaintiff's Fourth Amendment excessive force claim is based on Defendant's use of deadly force – in this case shooting Plaintiff – *after* Plaintiff "threw away the firearm[.]"  (*Id.*, ¶¶ 11-13.)  This Court has previously stated:

> In order to hold an officer liable for excessive force, the plaintiff must prove that the officer:  (1) actively participated in the use of excessive force; (2) supervised the officer who used excessive force; or (3) owed the victim a duty of protection against the use of excessive force.  *Turner v. Scott,* 119 F.3d 425, 429 (6th Cir.1997).

> Whether force is excessive is judged under the Fourth Amendment reasonableness standard.  *Graham v. Connor,* 490 U.S. 386, 395[] (1989).  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. . . . Proper application of the reasonableness test requires careful attention to "the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation omitted).  Reasonableness is judged from the perspective of a reasonable officer on the scene and not with the benefit of hindsight.  *Id.*  "Not every push or shove ... violates the Fourth Amendment." *Id.*  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Id.* at 396–397 . . . .

*Skover v. Titchenell*, 408 F. Supp. 2d 445, 449-450 (E.D. Mich. 2005) (Roberts, J.). *See also Slayton v. City of River Rouge*, 515 F. Supp. 3d 695, 702-703 (E.D. Mich. 2021) (Borman, J.) (discussing *Graham* factors), *reconsideration denied*, No. 17-13875, 2021 WL 859028 (E.D. Mich. Mar. 8, 2021), and *appeal dismissed sub nom. Slayton v. City of River Rouge, Michigan*, No. 21-1278, 2022 WL 1044040 (6th Cir. Apr. 7, 2022). "As in other Fourth Amendment contexts, . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

Here, it is undisputed that a gun was present during the incident in question. As Alexander alleges, "during the tussle [Rivers'] Firearm fell out of her holster and she reached for it to grab it, but [Alexander] grabbed it first . . . ." (ECF No. 1, PageID.2 ¶ 7.) He also alleges he "was holding [the] Firearm," when Defendant Wade "arrived on the scene[.]" (*Id.*, ¶ 8.) It is also undisputed that Defendant Wade "instructed [Alexander] to drop the firearm" and shot Alexander. (*Id.*; *see also* ECF No. 30, PageID.301-302 [Wade's state court testimony].)

What is in dispute is whether the force used was "excessive[,]" and the particular "reasonableness" factor at issue here is "whether the suspect pose[d] an immediate threat to the safety of the officers or others[.]" *Graham*, 490 U.S. at

9

396.  Plaintiff alleges that, when Wade "instructed [him] to drop the firearm," Plaintiff "immediately threw the firearm away . . . [,]" (ECF No. 1, PageID.2 ¶ 8), at which point he would have been "unarmed[,]" (ECF No. 30, PageID.255). Arguing that he "did not pose an immediate threat of physical harm to Ms. Rivers[,]" Plaintiff points to evidence that:  (a) he did not threaten Rivers; (b) he did not hold a gun to her head; and (c) both he and Rivers were in a standing position.  (*See* ECF No. 30, PageID.257, 260-261 (citing, *inter alia*, *id.*, PageID.271 ¶ 17; *id.*, PageID.267 ¶ 21; *id.*, PageID.275 ¶ 22; *id.*, PageID.329).)

Thus, there is a question of fact regarding whether Alexander posed "an immediate threat to the safety of the officers or others[.]"  *Graham*, 490 U.S. at 396.  *See Deis v. Mitchell*, No. 18-10482, 2020 WL 7024696, at *8 (E.D. Mich. Nov. 30, 2020) (Hood, J.) (in the context of discussing "qualified immunity for excessive force," the Court observed that "Deis has offered sufficient evidence to create a genuine issue of material fact regarding each element of his excessive force claim."); *Parsons v. City of Ann Arbor*, No. 2:20-CV-10486, 2021 WL 795676, at *5 (E.D. Mich. Mar. 2, 2021) (Murphy, J.) (in the context of discussing Plaintiff's Section 1983 claim against an officer, "Plaintiff plausibly alleged an excessive force claim under the *Graham* factors.").

### 3.      Qualified immunity

Wade argues that he "is entitled to qualified immunity from Plaintiff's excessive force claim."  (ECF No. 26, PageID.146 ¶ 6; *id.*, PageID.155-158.) "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken[.]"  *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quoting *Harlow*, 457 U.S. at 818-819).

### a.      Clearly established right(s)

Defendant argues that he is entitled to qualified immunity from Plaintiff's excessive force claim, because his "conduct did not violate any clearly established rights of Plaintiff."  (ECF No. 26, PageID.155, 157.)  The Supreme Court has stated that *Graham* – notably, a case in which qualified immunity was not raised, *see Graham*, 490 U.S. at 399 n.12  – "clearly establishes the *general* proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness."  *Saucier v. Katz*, 533 U.S. 194, 201-202

11

(2001) (emphasis added).  Yet, "the right the official is alleged to have violated

must have been 'clearly established' in a more *particularized*, and hence more

relevant, sense:  The contours of the right must be sufficiently clear that a

reasonable official would understand that what he is doing violates that right."

*Anderson*, 483 U.S. at 640 (emphasis added).  "The relevant, dispositive inquiry in

determining whether a right is clearly established is whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted."

*Saucier*, 533 U.S. at 202; *see also Kingsley v. Hendrickson*, 576 U.S. 389, 400

(2015).  As the Supreme Court has explained:

> "Qualified immunity attaches when an official's conduct does not
> violate clearly established statutory or constitutional rights of which a
> reasonable person would have known." *White v. Pauly*, 580 U.S. [73,
> 78-79] (2017) (per curiam ) (alterations and internal quotation marks
> omitted).  "Because the focus is on whether the officer had *fair notice*
> that her conduct was unlawful, reasonableness is judged against the
> backdrop of the law at the time of the conduct." *Brosseau v. Haugen*,
> 543 U.S. 194, 198[](2004) (per curiam ).

*Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (emphasis added).  The Supreme

Court has "repeatedly told courts . . . not to define clearly established law at a high

level of generality."  (*Id*. (citations and quotations omitted).)  "An officer 'cannot

be said to have violated a clearly established right unless the right's contours were

sufficiently definite that any reasonable official in the defendant's shoes would

have understood that he was violating it.'" *Kisela*, 138 S. Ct. at 1153 (quoting

*Plumhoff v. Rickard,* 572 U.S. 765, 778-779[](2014)). *See also City of Escondido,*

*Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Kisela*).  (ECF No. 26, PageID.156-157.)

### b.    Use of deadly force

While Defendant Wade acknowledges that "the right to be free from excessive force" is clearly established, and while he also acknowledges that the basis of Plaintiff's excessive force claim "is the fact that [Defendant Wade] shot Plaintiff[,]" Defendant Wade contends it is clearly established law that "a police officer may use deadly force when the suspect poses an immediate threat of serious physical harm to the officer or others[.]"  (ECF No. 26, PageID.157.)

"Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."  *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  *See also Sample v. Bailey*, 409 F.3d 689, 696 (6th Cir. 2005) ("the Fourth Amendment prohibits a police officer's use of deadly force to seize an unarmed, non-dangerous suspect.").  "A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."  *Tennessee*, 471 U.S. at 11.  On the other hand,

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.  Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary *to prevent escape*, and if, where feasible, some warning has been given.

*Id.*, 471 U.S. at 11-12 (emphasis added). *See also Scott v. Harris*, 550 U.S. 372, 381-382, 386 (2007) (citing *Graham*, explaining that *Garner* "was simply an application of the Fourth Amendment's 'reasonableness' test," and concluding that "[a] police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death.").

The case at bar is "an obvious case," *i.e.*, it is one that "does not present a novel factual circumstance such that a police officer would be unaware of the constitutional parameters of his actions." *Sample*, 409 F.3d at 699. As far back as 2005, the Sixth Circuit stated: "[I]t has been clearly established in this circuit for the last twenty years that a criminal suspect 'ha[s] a right not to be shot unless he [is] perceived to pose a threat to the pursuing officers or to others during flight.'" *Sample*, 409 F.3d at 699 (citing *Robinson v. Bibb,* 840 F.2d 349, 351 (6th Cir.1988)). In sum, "regardless of whether the incident took place at day or night, in a building or outside, whether the suspect is fleeing or found, armed or unarmed, intoxicated or sober, mentally unbalanced or sane, it is clearly established that a reasonable police officer may not shoot the suspect unless the suspect poses a perceived threat of serious physical harm to the officer or others." *Sample*, 409 F.3d at 699.

14

### c. There are questions of fact within the reasonable belief inquiry.

"[W]hen a police officer both knows a defendant has a weapon *and* has a reasonable belief that the weapon will be used against him or others, the officer is justified in using deadly force." *Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007). However, as Plaintiff notes, "even when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is not justified." *Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007) (internal and external citations omitted). (*See* ECF No. 30, PageID.258, 261.) *Thus, the Court must consider the reasonableness of Wade's belief that Alexander posed a threat of serious physical harm to Rivers or others*.

### i. There is a question of fact as to whether Alexander was pointing the gun to Rivers' head.

In support of Defendant Wade's claim that he "reasonably believed" Plaintiff's actions "posed an immediate threat of physical harm to Starr Rivers," thus "allowing him to use deadly force to stop Plaintiff from causing said serious physical harm[,]" Defendant Wade cites:

- The October 10, 2018 Police Report narrative, wherein Wade stated he "could hear a loud commotion outside, and a female voice stating 'stop please why are you doing this to me'." Wade "also observed a neighbor directly across from me stating 'stop beating that woman please stop please'." Wade "walked outside, heading east on Rohns Street and [he] could hear a

15

female stating 'you gone shoot me'."  When Wade was positioned "on the sidewalk just in [front of] a vacant field[,]" he "observed a black female on the ground (in dirt) with a male suspect standing over her.  The suspect had [one] hand wrapped around the female's hair while holding a semi-auto handgun to her head."  (ECF No. 26-2, PageID.163; ECF No. 30-1, PageID.372.)

- Alexander's August 9, 2022 deposition transcript, which reflects his acknowledgement of a physical altercation on October 10, 2018, his testimony that he was holding Ms. Rivers' gun but did not hold it to her head, and his admission to hearing Defendant Wade say, "police, drop your weapon[,]" after which Plaintiff "threw the gun to the right up against some bushes by the fence[,]" and "at the same time as I threw the gun, I kind of like pushed Star off with my left hand . . . ." (ECF No. 26-4, PageID.190, 191, 192; *see also* ECF No. 30, PageID.282-290.)

- Starr Rivers' October 10, 2018 statement that she and Alexander were fighting (both physical and verbal) and Alexander "put [her] on the ground."  (ECF No. 26-5, PageID.214-217; *see also* ECF No. 30-1, PageID.364-367.)

- Jakkia Jackson's October 12, 2018 statement that Alexander and Rivers were "tussling over the ground[,]" Officer Wade "walked . . . towar[d] where [Rivers] and [Alexander] were . . . [,]" and "[Alexander] had [Rivers] in a head lock / choke hold with his left arm and the gun in his right han[d][.]"  (ECF No. 26-5, PageID.219; *see also* ECF No. 30, PageID.294-297)

- Donta Claude Johnson's October 10, 2018 statement that "the off-duty officer (Wade) was yelling after the first shot 'where is the gun where is the gun[,]'"  (ECF No. 26-5, PageID.225; *see also* ECF No. 30, PageID.317-318), which indicates Defendant Wade "clearly did not see Plaintiff throw the gun."

(ECF No. 26, PageID.157-158.)  Based on this evidence, Defendant Wade

maintains he "reasonably believed Ms. Rivers' life to be in danger."  (*Id.*,

PageID.159.)  The Court also notes Wade's testimony at the state court trial:  "I just remember seeing a pistol pointed at her head, and he was yelling something to her at that time."  (ECF No. 30, PageID.301; *see also id*., PageID.305, 313.)

However, Alexander disputes that "he was standing over Ms. Rivers and she was on the ground and [he] was grabbing her hair with one hand holding Ms. Rivers' gun to her head."  (ECF No. 30, PageID.252.)  (*See also id*., PageID.245 ¶ 2; *id*., PageID.258.)  In support of this position, Plaintiff cites:

- Rivers August 2, 2020 affidavit, wherein she attests that Alexander "did not hold the gun to my head and did not threaten to kill me." (ECF No. 30, PageID.271 ¶ 17.)

- Jakkia Jackson's January 18, 2022 affidavit, wherein she attests that she "never saw Isaac point a gun at Starr's head[.]  [H]e just had the gun to his side in his right hand." (ECF No. 30, PageID.275 ¶ 21.)

- Larry Crane's state court testimony that "it wasn't like [Alexander] had the gun up over her head like this (indicating). He had the gun to the side of her head ." (ECF No. 30, PageID.338.)

(ECF No. 30, PageID.257, 259, 261.)  In addition, the Court notes Plaintiff's August 10, 2020 affidavit, wherein he attests that he "I never put the gun to Starr's head, and I did not threaten to kill her[,]" (ECF No. 30, PageID.267 ¶ 21), and Plaintiff's August 9, 2022 deposition, when he answered "no" to the question, "At any point during this altercation, did you hold her gun to her head?"  (ECF No. 30, PageID.285.)  (*See also id*., PageID.285-288.)

### ii.   Whether the gun was pointed at another person is significant to the reasonableness inquiry.

Defendant Wade further maintains that, even if Plaintiff "was not pointing the gun at Ms. Rivers' head," it would still have been "reasonable for an officer observing this scene to assume that the Plaintiff was posing an immediate threat of serious physical harm to Ms. Rivers . . . [,]" because "she was on the ground, he was standing over her grabbing her hair and holding a gun, and they were in the middle of a physical altercation that had been going on for several minutes." (ECF No. 26, PageID.159.)  Thus, "[a]t any second[,] [Alexander] could have shot Ms. Rivers or another bystander." (*Id.*)

Yet, Plaintiff disputes that Rivers' "life was in immediate danger[.]" (ECF No. 30, PageID.245 ¶ 4; *see also id.*, PageID.254, 260.)  In this regard, Plaintiff cites:

- Rivers' August 2, 2020 attestations that she "grabbed [Alexander] by the shirt, then he grabbed [her] by the shirt and swung [her] to the car[,]" and [they] ended up on the ground, in each other's faces[;]" they "both stood up[;]" Alexander "did not hold the gun to [her] head and did not threaten to kill [her][;]" and, she "was not afraid that he would hurt or kill [her] during this altercation.  [She] considered it a typical girlfriend/boyfriend argument." (ECF No. 30, PageID.270-271 ¶¶ 6, 12, 17, 18.)

- Rivers' statements that she and Alexander were "on the side of Buck's car on the ground," Alexander "put [her] on the ground[,]" she "told him to let [her] up," and that is "when [she] realized [her] gun came off [of her].  When he let [her] up, [she] swung [at] him.  He grabbed [her] shirt & [she] had a hold

18

of his shirt.  Then [she] heard shots & it was over."  (ECF No. 30, PageID.277-278.)

- Jackson's attestations that "[t]hey beg[a]n to argue and get loud and grabb[ed] each other by their shirts and tussl[ed] by the side of [her] boyfriend's car[;]" Wade "walked to the front right side of [her] boyfriend's car then turned towards the field where Isaac and Starr w[ere] standing at arguing with each other[;]" she "never saw Isaac point a gun at Starr's head[,] he just had the gun to his side in his right hand[;]" and, she "never heard Isaac threaten to harm Starr or say anything threat[en]ing towards the police officer but [']why you shoot me I didn[']t have [a] gun.'"  (ECF No. 30, PageID.274-275 ¶¶ 8, 16, 21-22.)

- Alexander's deposition testimony that the earring in his car belonged to "a person that was in the car with [him] like the day before and [he] had dropped her off at home that morning[,]" and that Starr's gun fell from "her side, like in her hip area." (ECF No. 30, PageID.285.)

- Starr Rivers' November 7, 2021 email to Plaintiff (then at LCF), wherein she describes seeing Alexander "in the car with a bitch" and Rivers "pulled the gun out on [them][.]"  (ECF No. 30, PageID.292.)

- Jackson's statements that "Ike & Starr were on the ground when Ike took Starr's gun off her[,]" they "get off the ground & are now tussling over the ground[,]" and she does not remember "seeing hits thr[own].  It was more like him trying to tame her so she couldn't get to the gun."  (ECF No. 30, PageID.294-296.)

- Claude Johnson's state court trial testimony that, "[w]hen the officer approached, I s[aw] both of them standing, and I could see both of their heads[,]" he did not "hear Starr say leave me alone[,]" and "it's like she [had] his shirt[,]" and they were "at each other."  (ECF No. 30, PageID.325, 328.)

19

- Larry Crane's state court trial testimony that Alexander grabbed Rivers "[t]owards her neck and chest area," by "the collar . . . [,]" that "when the officer identified himself" Rivers and Alexander were "off the ground[,]" and that, while Alexander "was shaking [Rivers'] head[,]" it "wasn't like he had the gun up over her head . . . [Alexander] had the gun to the side of her head." (ECF No. 30, PageID.333, 336, 338).[5]

(ECF No. 30, PageID.260-261.)  Elsewhere in his response, Alexander cites his August 10, 2020 affidavit, which states they "hit the ground and her gun came off her hip[,]" and he "grabbed it before she could because she was so mad at me [he] was afraid she might shoot[,]" (ECF No. 30, PageID.267 ¶ 16).  (*Id.*, PageID.251.)

As Alexander specifically notes, "it is not reasonable for an officer to use deadly force on an individual just because he believes that the individual possesses a gun." *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 511 F. Supp. 3d 809, 821-822 (M.D. Tenn. 2021), *aff'd*, 47 F.4th 468 (6th Cir. 2022).  In *Campbell*, the court explained:

> [M]erely possessing a weapon is not enough—the officer must reasonably believe the individual poses a danger of serious physical harm to himself or others to justify deadly force." *Jacobs*, 915 F.3d at 1040 (*citing Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007)); *see also Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 366 (6th Cir. 2017) ("[W]e do not hold that an officer may shoot a suspect merely because he has a gun in his hand. Whether a suspect has a weapon constitutes just one consideration in assessing the totality of the circumstances.").  As explained by the Sixth Circuit, "the reasonableness of an officer's asserted fear" of an individual who they reasonably believed to possess a gun "will often turn on whether

---

[5] The record also contains an October 10, 2018 statement from Larry Crane, Jr. (ECF No. 30, PageID.340-341.)

an armed suspect pointed h[is] weapon at another person." *Hicks v.
Scott*, 958 F.3d 421, 435-436 (6th Cir. 2020) (collecting cases).

*Campbell*, 511 F. Supp. 3d at 821-822 (emphases added).  (*See* ECF No. 30,

PageID.254, 258, 262.)

> ### iii.     There is also a question of fact as to whether Alexander complied with Wade's directive to drop the weapon.

Plaintiff alleges that he "immediately complied with [Defendant's] order to

drop the firearm," by "immediately thr[owing] the firearm away."  (ECF No. 1,

PageID.3 ¶¶ 11-12.)  Plaintiff claims he "follow[ed] officer Wade's orders to drop

the weapon by throwing the weapon into the bushes up against a gate[,]" yet,

Officer Wade shot Plaintiff.  (ECF No. 30, PageID.252, 253, 254-255, 259.)  In

support of this, Plaintiff cites:

- Alexander's August 10, 2020 sworn attestations that "I saw the officer and heard him say to drop the gun, so I threw it[,]" and "I was then shot."  (ECF No. 30, PageID.267 ¶¶ 18, 19.)

- Rivers' August 2, 2020 sworn attestations that she "remember[s] Mr. Alexander putting his hands up[,]" and she "heard shots, then Mr. Alexander was on the ground."  (ECF No. 30, PageID.271 ¶¶ 13, 14.)

- Jackson's January 18, 2022 sworn attestation that she "heard the officer say 'Police drop your weapon[,]' she "looked over at Isaac and saw him push Starr away from him and put his hands in the air[,]" and then she "heard two shots go off[,]" and "then Isaac fell to the ground."  (ECF No. 30, PageID.274 ¶ 17.)

- Rivers' October 10, 2018 statement that she did not know where her gun went, but "when [she] got up it was to the right

21

of [her] in the bushes by the fence."  (ECF No. 30, PageID.279.)

- Jackson's October 12, 2018 statements that Officer Wade "pulled his gun telling Ike to drop his weapon[,]" then "Ike threw the gun in the bushes next to the gate[,]" and then "Ike had his hands in the air saying something like this is between me [and] my girl.  That's when the shot went of[f] [and] Ike fell to the ground."  (ECF No. 30, PageID.295.)

- Donta Claude Johnson's October 10, 2018 statements that "he (Wade) walked up to (Bae Bae and Ikey) and told them 'Detroit Police' and . . . told them to put their hands up[,]" and "when the off-duty officer (Wade) pointed his gun at (Ikey) he threw the gun and then he (Wade) shot him[,]" and also "the off-duty officer (Wade) was yelling after the first shot 'where is the gun where is the gun'[,]" and "he [Donta] heard another shot." (ECF No. 30, PageID.317-318.)

(ECF No. 30, PageID.256-257.)  Indeed, Alexander cites the allegation that Wade was yelling "where is the gun…where is the gun" as evidence that Wade "clearly did not see Plaintiff throw the gun."  (ECF No. 30, PageID.259.)  And, regardless of whether Wade saw Alexander *throw* the gun (*i.e.*, the action), the question itself is evidence that Wade did not *see* a gun (*i.e.*, the object) during the most crucial timeframe of these unfolding events.

### d.  Distinct inquiries

To be clear, the qualified immunity analysis and excessive force question are distinct inquiries.  In *Saucier*, the Supreme Court considered "whether the requisite analysis to determine qualified immunity is so intertwined with the question whether the officer used excessive force in making the arrest that qualified

immunity and constitutional violation issues should be treated as one question, to be decided by the trier of fact[,]" and held that "the ruling on qualified immunity requires an analysis not susceptible of fusion with the question whether unreasonable force was used in making the arrest." *Saucier*, 533 U.S. at 197.  The Supreme Court explained that "*Graham* did not change the qualified immunity framework explained in *Anderson.* The inquiries for qualified immunity and excessive force remain distinct, even after *Graham*."  *Saucier*, 533 U.S. at 204. "[I]n excessive force cases, . . . in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event the mistaken belief was reasonable." *Saucier*, 533 U.S. at 206.

Because Plaintiff has shown various questions of fact that bear upon the reasonable belief inquiry, this Court should submit to the jury the question of whether Wade is entitled to qualified immunity on Plaintiff's constitutional claim. For example, in a case where this Court found that a plaintiff "ha[d] offered sufficient evidence to create a genuine issue of material fact regarding each element of his excessive force claim[,]" and that "[d]efendants must be granted the opportunity to present evidence that might persuade a jury to find that Deis' resistance, as perceived by the officers, was sufficient enough that an objectively reasonable law enforcement officer would have believed it[,]" the court explained:

> When qualified immunity cases turn "upon which view of the facts is accepted by the jury," the "jury becomes the final arbiter of [a] claim

of immunity." *Brandenburg v. Cureton*, 882 F.2d 211, 215–16 (6th
Cir. 1989); *Bouggess v. Mattingly*[,] 482 F.3d 886, 888 (6th Cir.
2007); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893,
900 (6th Cir. 2004) (quoting *Pouillon v. City of Owosso*, 206 F.3d
711, 715 (6th Cir. 2000) ("However, where the legal question of
qualified immunity [in an excessive force case] turns upon which
version of the facts one accepts, the jury, not the judge, must
determine liability")); *Stickney v. Trikes*, 1990 WL 110855, *1 (6th
Cir. 1990) (unpublished) ("It may well be that, under the
circumstances present here, Officer Young acted in an objectively
reasonable manner. That, however, is a question of fact and does not
constitute the predicate for a claim of qualified immunity.").

*Deis v. Mitchell*, No. 18-10482, 2020 WL 7024696, at *8 (E.D. Mich. Nov. 30,

2020) (Hood, J.).  (ECF No. 30, PageID.255, 260.)  Ultimately, this Court denied

the defendant officers' request for qualified immunity on the excessive force claim

and denied the plaintiff's motion for summary judgment as it pertains to excessive

force.  (*Id.*)  *See also Parsons*, 2021 WL 795676, at *5-*6 ("Plaintiff plausibly

alleged an excessive force claim under the *Graham* factors[,]" but "the Court d[id]

not have enough of a factual record to resolve [the officer's] qualified immunity

claim . . . .").

Likewise, in a case where the Sixth Circuit affirmed Judge Cohn's denial of

an officer's motion for summary judgment on the basis of qualified immunity, the

Court considered whether the officer's "decision to fire at the individual standing

in the doorway [was] objectively unreasonable in light of a clearly established right

to be free from deadly force?"  *Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir.

2010).  With respect to the specific question of "whether Officer Lewis actually

saw a flash of light in the doorway that he believed to be a muzzle flash . . . [,]" the Sixth Circuit stated: "'the court may not simply accept what may be a self-serving account by the police officer. It must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story . . . .'" *Jefferson*, 594 F.3d at 462 (quoting *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir. 1994)). (ECF No. 30, PageID.255, 262.) The Court noted that Jefferson's testimony "regarding the lack of ambient light [wa]s sufficient to support an inference that could discredit Officer Lewis's testimony." *Jefferson*, 594 F.3d at 462. Ultimately, based on "the competing inferences one might draw from these facts" and "their effect on the question of whether Officer Lewis's actions were objectively unreasonable," the Sixth Circuit agreed that "the jury should find the facts that determine whether Officer Lewis is entitled to qualified immunity." *Id.*, 594 F.3d at 462-463.)

The approach taken in *Deis*, *Parsons*, and *Jefferson* is warranted here.

### F.    Conclusion

As set forth in great detail above, Plaintiff has illustrated questions of fact regarding whether Alexander posed "an immediate threat to the safety of the officers or others," *Graham*, 490 U.S. at 396 (*see* Section E.2), and whether Wade reasonably believed that there was a threat of serious physical harm (*see* Section

25

E.3.c). Accordingly, the Court should **DENY** Defendant Wade's motion for partial summary judgment (ECF No. 26) and permit Plaintiff's constitutional claim to proceed.

## III. PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc*. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc*.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated:  May 9, 2023                                   s/*Anthony P. Patti*
                                                                  Anthony P. Patti
                                                                  UNITED STATES MAGISTRATE JUDGE